J^CLARENCE E. McMANUS, Judge.
This is an appeal by the state from the trial court’s ruling granting defendant’s motion to quash the indictment. For reasons that follow, we reverse the ruling of the trial court and remand this matter for further proceedings.
On June 15, 2000, the St. Charles Parish Grand Jury issued a bill of indictment charging defendant, Laquinn Ingram, with attempted second degree murder of Brett Altazan. La. R.S. 14:27, 14:30.1. On June 21, 2000, defendant was arraigned, and pled not guilty.
On January 29, 2002, under a separate case number, the St. Charles Parish District Attorney’s Office filed a bill of information charging defendant with armed robbery of Brett Altazan. The armed robbery charge arose out of the same operative facts as the attempted murder. Defendant was tried and acquitted on the armed robbery charge.
| ,qOn June 10, 2002, defendant filed a motion to quash the murder indictment, claiming that the state was collaterally es-topped under the Fifth Amendment’s Double Jeopardy Clause from trying him for second degree murder. The trial court granted defendant’s motion, and the state filed for writ of review. This Court ordered that the state’s application for supervisory review would be considered as an appeal.
In its sole allegation of error, the state contends that the trial court erred in granting defendant’s motion to quash the indictment for attempted second degree murder following defendant’s acquittal on the related armed robbery charge. Defendant responds that the trial court’s ruling was sound, in that the state is barred from trying him for attempted second degree murder under the doctrine of collateral estoppel. He argues that an ultimate issue of fact, the identity of the perpetrator, has been resolved by his acquittal on the armed robbery charge.
The Fifth Amendment’s Double Jeopardy Clause protects against successive prosecutions following acquittal or conviction, as well as multiple punishments for the same offense. See also, LSA-Const. art. I, § 15; La.C.Cr.P. art. 591 et seq. The collateral estoppel component of the Double Jeopardy Clause prohibits the state from relitigating an issue of ultimate fact that has been determined by a valid and final judgment. Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); State v. Cotton, 00-0850, pp. 5-6 (La.1/29/01), 778 So.2d 569, 574, reh’g granted in part, on other grounds, 00-0850 (La.4/20/01), 787 So.2d 278. A fact is considered “ultimate” if it is necessary to a determination of the defendant’s criminal liability. State v. Miller, 571 So.2d 603, 607 (La.1990).
Collateral estoppel bars relitigation of only those facts necessarily determined in the first trial. United States v. Brackett, 113 F.3d 1396, 1398 (5th Cir. 1997), cert. denied, 522 U.S. 934, 118 S.Ct. 341, 139 L.Ed.2d 265 (1997). Where a fact is not necessarily determined in a previous trial, the state is not barred Rfrom reexamining the issue. Id. Accordingly, the first step in resolving a collateral estoppel claim is to discern which facts were “necessarily determined” in the first trial. Id.
The courts have placed the burden “on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.” Dowling v. United States, 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990). The application of this test to *717 criminal cases is complicated by the fact that an acquittal by general verdict does not specify the facts “necessarily decided” by the jury. Therefore, to determine which facts were “necessarily decided” by the general acquittal in the first trial, it is necessary to examine the record of the prior proceeding in order to determine “ ‘whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.’ ” Ashe v. Swenson, 397 U.S. at 444, 90 S.Ct. at 1194 (citations omitted).
In addition to the statutory elements of the charged offense, the state is required to prove the identity of the perpetrator. State v. Bradley, 03-384, p. 6 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 85, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688. Identity is, therefore, an “ultimate fact.” Defendant argues that, because his armed robbery and attempted murder charges arose out of the same series of events, the armed robbery jury “necessarily decided” the issue of identity.
In ruling on defendant’s motion to quash, the trial judge considered defendant’s earlier jury acquittal on an armed robbery charge that was factually related to the attempted murder charge. The trial judge stated that he based his decision granting the motion to quash on his belief that the jury found that defendant was not present at the beating of the victim.
In this appeal, the state argues the trial court erred in finding that the armed robbery jury determined he was not present at the crime scene. The state submits | Bthat the jury’s unanimous verdict of not guilty was likely based on grounds other than identity, and that the jury did not determine an ultimate issue of fact. Defendant counters that the jury’s verdict was based on identity, an ultimate issue of fact. He argues that the state is, therefore, barred from pursuing the attempted murder charge by the principals of collateral estoppel.
At the armed robbery trial, Charles Bri-za testified that he and the victim, Brett Altazan, were employed by a Baton Rouge towing company on one of its tugboats. They worked on the Mississippi River. On the evening of February 12, 2000, Briza and Altazan got off the boat at Hahnville so Briza could cash a cheek. Briza testified that Altazan asked him for money, and that he gave Altazan between $40 and $60. After Briza gave him the money, Altazan went off alone for twenty to thirty minutes.
That evening the two men went twice to a convenience store attached to a Shell filling station on River Road. Briza testified that he saw about twelve young men in the Shell parking lot. One of them was holding a baseball bat. When Briza went into the store the first time, Altazan stayed outside. As the two men were leaving the filling station, four or five of the young men in the parking lot attempted to talk to Altazan.
Briza and Altazan returned to the Shell station some time later. While Briza was inside buying beer, he saw some of the young men approach Altazan outside the store. Briza exited the store and gave Altazan a beer. Briza testified that two black men in a car circled them in the parking lot. One of the men told Altazan something like, “ T already told you one time.’ ”
Briza and Altazan became concerned for their safety, and they tried to find a ride back to their boat. When their attempts were unsuccessful, they began walking. The young men loitering outside the store followed them. Some of them cornered Altazan in back of a nearby house. Briza lost sight of his friend. He | Rfrantically *718 knocked on the door of the residence in an effort to summon help. The man inside the house would not open the door. Briza searched for Altazan, and found him, unmoving, on the ground. Altazan’s head had been badly beaten, and he was making gurgling sounds. Briza went to the door of the house again and asked the resident to call police. The man complied.
Police reported to the scene, and Alta-zan was airlifted to West Jefferson Medical Center in Marrero. Dr. John Steck, a neurosurgeon at West Jefferson, testified that he treated Altazan’s head injuries. He stated that the victim’s skull was fractured in several places, and that a large portion of his skull had separated from the surrounding bone. The doctor further testified that the injuries were consistent with several blows from a baseball bat. Lizette Hebert, Altazan’s sister, testified that the victim was forty-two years old, and was confined to a wheelchair due to the head injuries he sustained in the attack. Alta-zan must live at a nursing facility, where he receives full-time care. Briza testified that he did not see who attacked Altazan. Two days after the incident, he returned to the Shell station and saw Ralph Dee, whom he recognized as one of the young men in the parking lot before the attack. Briza reported the sighting to police. Dee testified at trial that police went to his house and questioned him. Detective Renee Kinler of the St. Charles Parish Sheriffs Office testified that, based on Dee’s statement, she obtained a warrant for the arrest of defendant, Laquinn Ingram.
Dee testified that he and his friend were talking in the Shell parking lot when Briza and Altazan appeared. When they saw the two men had money, they discussed taking it and using it to get into a party later that night. Defendant followed Briza and Altazan, carrying a bat that Dee had brought to the parking lot. Dee caught up with defendant, and saw him hitting the victim with the bat. Dee testified that defendant was holding the bat with both hands and swinging it as if he were playing baseball. Dee said it looked to him as if defendant went through |7Altazan’s pockets. Although he assumed defendant took something from the victim, Dee conceded that he was not certain of that. Dee grabbed defendant and told him they had to leave.
Gabriel Bennett, age fifteen at the time of the incident, testified that was among the group of young men in the Shell parking lot. He and defendant were discussing a party they planned to attend that night. Bennett saw Briza and Altazan leaving the parking lot. He testified that he saw Ralph Dee with a wooden baseball bat.
Bennett testified that, as Briza and Alta-zan left the parking lot, defendant said he was going to rob them. Defendant took off after the two men. Bennett followed defendant across River Road. Bennett testified he saw the victim lying on the ground, and defendant was beating him with a bat. Defendant hit the victim about eight times. While defendant was beating Altazan, Bennett searched the victim’s jacket for money. He did not find any. Bennett saw defendant checking around the victim’s ankles for money, but he did not see defendant take anything at that point. Defendant later showed Bennett about $40 in cash, and told him he had taken the money from the victim.
Bennett testified that neither he nor Ralph Dee hit the victim. Eventually Dee took the bat from defendant and ran away with it.
Graille Howard testified that she went to the convenience store at the Shell station at about 9:15 on the night of February 12, 2000. She saw a lot of people in the parking lot, which was not unusual. Alta-zan and Briza asked her for a ride, and she *719 refused them. Howard said she saw defendant leaving the parking lot when she arrived at the filling station, but she did not see him when she left a short time later.
Nathaniel Evans testified that he picked up defendant from his home in Hahnville between 10:00 and 10:30 on the night of February 12, 2000. They went | sto a party in Laplace. Evans testified that he did not see defendant with any money that night. On the contrary, defendant borrowed money from others to pay the party’s $10 cover charge.
On cross-examination, Dee testified that he repeatedly lied to police during their investigation in order to protect himself and Bennett. Dee said he did not cooperate with the prosecution until after Bennett was convicted of armed robbery. He then agreed to testify for the state in exchange for a suspended sentence. Bennett stated he was testifying for the state in exchange for the prosecutor’s recommendation that he be sentenced to ten years on his armed robbery conviction.
In Ashe, 397 U.S. at 445, 90 S.Ct. at 1195, the Supreme Court concluded that the jury’s general verdict of acquittal “necessarily decided” the question of identity in the defendant’s armed robbery prosecution, as identity was the “single rationally conceivable issue in dispute before the jury.” The Ashe court found that “the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery.” Id. The instant case is factually distinguishable from Ashe, in that defendant’s jury might just as likely have based its verdict on the state’s failure to prove there was a taking. The only evidence at trial to support a finding that defendant took something of value from Altazan (a required element under LSA-R.S. 14:64) was Bennett’s testimony that defendant later showed him some money and claimed he took it from the victim. Gabriel Bennett and Ralph Dee were both witnesses to the attack, and neither could say he saw defendant take something from Altazan.
“When a 'fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue.’ ” United States v. Brackett, 113 F.3d at 1398 (quoting United States v. Lee, 622 F.2d 787, 790 (5th Cir.1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981)). While it is possible that the armed robbery jury based its verdict on the identity issue, it is equally possible that it did not. The state is not, therefore, precluded by collateral estoppel from trying defendant on the attempted murder charge. The state may not try defendant under the felony murder section of La. R.S. 14:30.1, using armed robbery as the supporting felony, as that would constitute double jeopardy. Rather, it must try defendant under the specific intent provisions of the statute.
Accordingly, we find that the trial court erred in granting defendant’s motion to quash the indictment. We therefore reverse the trial court’s ruling, reinstate the indictment, and remand the case for further proceedings.

JUDGMENT GRANTING MOTION TO QUASH REVERSED, INDICTMENT REINSTATED, CASE REMANDED.